Nos. 2-20-0025, 2-20-0034, 2-20-0059 cons.
Opinion filed February 1, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) ) ) | Nos. 12-CM-5438 17-CM-1492 19-CM-2345 |
| MICHAEL J. CORBETT, | ) ) | Honorable Salvatore LoPiccolo Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices Hutchinson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1   On November 19, 2019, the trial court conducted a combined jury and bench hearing on the fitness of defendant, Michael J. Corbett, to stand trial, with the jury to decide the issue of fitness and the court to decide the issue of whether there was a substantial probability that defendant will attain fitness within one year if treated. 725 ILCS 5/104-16 (West 2018). The State, which had the burden to prove defendant fit, presented one expert witness, Dr. Jaime Thomas. Thomas opined, at length, that defendant was unfit. She also opined, in a conclusory manner, that it was substantially probable that defendant could be restored to fitness within one year if provided with an appropriate course of treatment. At the close of the State's case, defense counsel moved for a

directed verdict that defendant was unfit. She argued only the fitness issue, and she did not address whether there was a substantial probability that defendant would be restored to fitness within one year. The State responded by "rest[ing] on the evidence presented," effectively conceding that it had not met its burden to prove defendant fit. The State added that, consistent with Thomas's opinion, there was a substantial probability that defendant would be restored to fitness within one year. Defense counsel then replied that she would "defer to the court" on the issue of restoration. The court granted defense counsel's motion for a directed verdict that defendant was unfit. It also determined, "based on the testimony of [Thomas]," that there was a substantial probability that defendant would be restored to fitness within one year and that inpatient treatment was the least restrictive form of appropriate treatment. The court's finding on the restoration issue resulted in defendant's remand to the custody of the Department of Health and Human Services, as opposed to defendant being granted a discharge hearing.

¶ 2     Defendant now appeals the trial court's finding that there was a substantial probability that he would be restored to fitness within one year, and he seeks a discharge hearing so that he can be given the opportunity to face the charges against him. Defendant argues that (1) defense counsel provided ineffective assistance by failing to challenge Thomas's opinion that there was a substantial probability that defendant would attain fitness within one year and (2) the trial court's substantial-probability determination was against the manifest weight of the evidence. We agree that defense counsel failed in her duty to take the basic steps necessary to ensure a fair determination of the restoration issue by failing to meaningfully cross-examine Thomas on the issue, failing to form and act upon an independent assessment of the issue, and, instead, merely deferring to the trial court on the issue. We also agree that the trial court's determination was

against the manifest weight of the evidence where it followed from scant and conclusory evidence. Accordingly, we reverse and remand.

¶ 3                                      I. BACKGROUND

¶ 4     The instant fitness case involves three separate criminal matters, all misdemeanors. The earliest of the three dates back to 2012. However, due to defendant's serial pattern of being declared unfit to stand trial, then restored to fitness, then again declared unfit to stand trial, none of these criminal matters have been resolved.

¶ 5                              A. The Underlying Offenses

¶ 6     In case No. 12-CM-5438 (12-CM), the State charged defendant, then age 54, with criminal trespass to land, aggravated assault, and resisting a peace officer. The charges alleged that defendant knowingly remained on the grounds of Hesed House, a homeless shelter in Aurora, after receiving notice from the staff to depart. When a police officer arrested defendant for trespass, defendant kicked the officer (aggravated assault charge) and then went limp (resisting charge). Criminal trespass to land was a Class B misdemeanor with a maximum sentence of six months in jail. Aggravated assault and resisting a peace officer were both Class A misdemeanors with a maximum sentence of one year in jail.

¶ 7     In case No. 17-CM-1492 (17-CM), the State charged defendant, then age 59, with aggravated assault and resisting a peace officer. The charges alleged that defendant attempted to strike a police officer with his fists after being threatened with arrest.[1] Defendant did not follow

---

[1] At a status hearing, defendant informed the court that he had a condition called Dupuytren's contracture, which caused his fingers to bend toward his palm. A 2018 discharge report from the Elgin Mental Health Center confirms that defendant has Dupuytren's contracture.

instructions to back away from the squad car and calm down. Aggravated assault and resisting a peace officer were, again, Class A misdemeanors with a maximum sentence of one year in jail.

¶ 8    Finally, in case No. 19-CM-2345 (19-CM), the State charged defendant, then age 61, with criminal trespass to land and assault. The charges alleged that defendant knowingly remained on the grounds of a liquor store in Aurora after receiving notice to depart. When a police officer arrived, defendant raised a closed fist at the officer (but did not strike him), and this formed the basis of the assault charge. Criminal trespass to land was, again, a Class B misdemeanor with a maximum sentence of six months in jail. Assault was a Class C misdemeanor with a maximum sentence of 30 days in jail.

¶ 9                                B. Procedural History

¶ 10    On December 31, 2012, the State charged defendant in 12-CM. During the pretrial stage of the proceedings, defense counsel raised, and the trial court found, a *bona fide* doubt as to defendant's fitness to stand trial. On November 18, 2014, the trial court conducted a jury fitness hearing (first fitness hearing, 12-CM). The jury determined that defendant was unfit but that there was a substantial probability that defendant would attain fitness within one year if treated. Defendant appealed the jury's findings, but this court granted appellate counsel leave to withdraw and affirmed. *People v. Corbett*, 2016 IL App (2d) 141195-U (first appeal).

¶ 11    On February 17, 2015, after defendant received three months of treatment, the trial court determined in a bench proceeding that defendant had been restored to fitness (first restoration hearing, 12-CM). Pretrial procedure in 12-CM resumed.

¶ 12    On June 6, 2017, while 12-CM remained pending, the State charged defendant in 17-CM. Pretrial procedure in 17-CM commenced, in a different courtroom and with different defense counsel than in 12-CM. Defense counsel in 17-CM ultimately raised and the trial court found a

*bona fide* doubt as to defendant's fitness and, on February 20, 2018, the trial court conducted a jury fitness hearing (second fitness hearing, 17-CM). The jury determined that defendant was unfit, but it was "unable to determine" whether there was a substantial probability that defendant would attain fitness within one year if treated. Pursuant to statute, the "unable to determine" finding required the trial court to order that defendant be treated and, as soon as possible, to conduct a hearing and render a substantial-probability determination.

¶ 13    Meanwhile, defense counsel in 12-CM informed the trial court that defendant had been found unfit in 17-CM. Thus, on March 23, 2018, the trial court conducted a bench fitness hearing (third fitness hearing, 12-CM). The parties stipulated to the testimony from the second fitness hearing. The court determined that defendant was unfit but that there was a substantial probability that defendant would attain fitness within one year if treated.

¶ 14    On August 10, 2018, the trial court conducted a consolidated restoration hearing, addressing defendant's fitness to stand trial in both 12-CM and 17-CM and heard by the same judge who had been handling 17-CM (second restoration hearing, 12-CM and 17-CM). The court determined that defendant had *not* attained fitness. Defendant appealed the trial court's determination, but this court determined that the issue was moot. *People v. Corbett*, 2020 IL App (2d) 180718-U (second appeal) (noting that, in November 2018, defendant was found fit to stand trial in 12-CM and 17-CM).

¶ 15    On November 2, 2018, the trial court determined at a bench proceeding that defendant had been restored to fitness (third restoration hearing, 12-CM and 17-CM). There, the parties stipulated to the findings of the evaluating psychologist. The court thereafter found defendant fit. Pretrial procedure in 12-CM and 17-CM resumed.

¶ 16    On September 3, 2019, the State charged defendant in 19-CM. Pretrial procedure in 19-CM commenced, during which defense counsel raised and the trial court found a *bona fide* doubt as to defendant's fitness. This finding set the stage for defendant's fourth fitness hearing.

¶ 17                              C. The Fourth Fitness Hearing

¶ 18    In preparation for the fourth fitness hearing, the trial court ordered defendant to report to the Kane County Diagnostic Center (KCDC) for an evaluation. Defendant moved *pro se* for an independent evaluation, defense counsel declined to adopt defendant's motion, and the court denied the motion. Ultimately, defendant refused to participate in the court-ordered evaluation. Thus, Thomas, the State's only witness, was unable to provide the court with a formal report.

¶ 19    Thereafter, commencing on November 19, 2019, the trial court conducted a combined jury and bench fitness hearing (fourth fitness hearing, 12-CM, 17-CM, *and* 19-CM), with the jury to decide the issue of fitness and the court to decide the issue of whether there was a substantial probability that defendant would attain fitness within one year if treated. During direct examination, Thomas testified that she was a forensic psychologist with the KCDC. She had been unable to conduct a formal evaluation on defendant because defendant refused to schedule an evaluation. Therefore, she relied on past fitness reports and her recent observations of defendant in court in forming her opinion that defendant was unfit to stand trial but that there was a substantial probability that defendant would attain fitness within one year if treated.

¶ 20    Thomas testified to past fitness reports that she had written to aid the court at the second fitness hearing in February 2018 and the second restoration hearing in August 2018. Specifically, Thomas first met with defendant in November 2017, when defendant went to the KCDC to make an appointment for a fitness evaluation in preparation for the February 2018 fitness hearing. Defendant wanted the interaction to be recorded. When he realized that Thomas could not

accommodate his request, he became upset, his speech was pressured, and he left without making an appointment. Defendant returned to the KCDC with a self-generated, 21-page document that she understood he considered his "fitness evaluation." The document was difficult to follow and contained information that was not relevant to the issue of fitness. It identified several judges, attorneys, and organizations that defendant believed were conspiring against him. It highlighted defendant's delusions of persecution and showed defendant's disorganized and illogical thought process, which was consistent with someone who has a psychotic spectrum disorder. Because defendant would not meet with her for a formal evaluation, Thomas relied on the 2014 KCDC fitness evaluation, her November 2017 interaction with defendant, and defendant's self-generated, 21-page "fitness evaluation" to support her conclusion that, as of February 2018, defendant had a delusional disorder of the persecutory type, had suffered multiple episodes of the same, was currently in an acute episode, and was, therefore, unfit to stand trial in February 2018.

¶ 21 Thomas next met with defendant in July 2018, when she sought to interview him in preparation for the second restoration hearing, held in August 2018. At that meeting, defendant talked about being punished before being found guilty. He also stated that Kane County officials were conspiring against him. Ultimately, he terminated the interview, believing that he had a conflict of interest with Thomas in that he had a lawsuit pending against her. (There was no such lawsuit.) Based on her July 2018 meeting with defendant, Thomas continued to believe that, as of August 2018, defendant suffered from a delusional disorder of the persecutory type and that he was unfit to stand trial in August 2018.

¶ 22 Thomas also testified to reports that treating physicians, Drs. Margarete Ronette and Timothy Olenek, had written to aid the court at the second restoration hearing. Ronette and Olenek diagnosed defendant with a personality disorder with antisocial and narcissistic features, not a

delusional disorder. In their view, such a personality disorder did not render defendant unfit, but neither was it amenable to treatment. They did agree, however, that defendant's behavior improved with medication.

¶ 23    Finally, Thomas testified to her own observations of defendant in recent court proceedings. At a September 13, 2019, status hearing, Thomas observed defendant nod off to sleep in the waiting area. When his case was called, defendant spoke loudly and with emotion, "present[ing] with the persistent fixed false beliefs that [Thomas] had seen in prior interactions" that "Kane County [state actors were] out to get him." Also, defendant demanded that the court order the KCDC to record his interview, as he believed was required by statute. When the court informed defendant that he misinterpreted the statute, defendant became irate and struggled to regulate his emotions. Thomas did not believe that the outburst was willful. Rather, due to defendant's disorder, "whenever his fixed false belief [system] is challenged, his low frustration tolerance will come out, his regulation decreases, and he is going to fight to defend those false beliefs that he has."

¶ 24    Thomas again diagnosed defendant as having "delusional disorder persecutory type, multiple episodes, currently in an acute episode." A person with a "delusional disorder" has fixed false beliefs. The "persecutory type" means that the patient believes that others are conspiring against him or her. Thomas did not consider whether defendant's disorder would prevent him from understanding the charges against him. She did, however, believe that it would prevent him from assisting in his own defense at trial. In her view, it was not that defendant was unwilling to assist but that he was unable to assist.

¶ 25    Finally, Thomas testified to the probability that defendant would be restored to fitness:

"Q. And based on a reasonable degree of scientific certainty, were you able to reach an opinion regarding whether there is a substantial probability that the defendant could be restored to fitness to stand trial within one year?

A. Yes.

Q. And what was that opinion?

A. It is my opinion that he would be able to be restored to fitness within one year's time.

Q. And can you explain to the Ladies and Gentlemen of the Jury how that might happen or what would be necessary to restore him to fitness within one year?

A. Sure. So typically, with fitness restoration, once someone has been found unfit to stand trial, they are either put into an outpatient facility or inpatient facility where they receive treatment to address the deficit they are presenting with. That could be knowledge about their criminal case; that could be knowledge about the court system in general; that could be medication management, behavior modification, or symptom reduction. So that would be the purpose of restoration.

Q. And do you have an opinion to a reasonable degree of scientific certainty as to what treatment is going to be necessary to restore [defendant] to fitness to stand trial?

A. Yes.

Q. What is that?

A. It is my opinion that he would need inpatient treatment.

Q. When you say 'inpatient treatment,' what do you mean by that?

A. Where he remains at a facility until his [fitness] has been restored.

Q. Okay."

¶ 26    During cross-examination, defense counsel elicited similar information as set forth above. In addition, defense counsel questioned Thomas about defendant's ability to function in society and his need for treatment. Thomas explained that a person with defendant's diagnosis may be able to function in society, as long as he is not performing a task that is centered around his fixed false beliefs. At times, a person with defendant's diagnosis may be able to control his behavior. There may be, for instance, court dates where there are no outbursts or negative behavior. The absence of outbursts could mean that the person is getting better, or it could mean that the particular court proceeding did not address the person's fixed false beliefs. Thomas elaborated:

"Q. So a person who has this condition but is not exhibiting outbursts can still be unfit to stand trial?

A. Correct.

Q. Do these delusions go away on their own?

A. It would be very improbable for them to go away on their own. They are entrenched fixed beliefs that the person has bought into and kind of engrained into their belief system for a long period of time.

It typically takes medication management and ongoing treatment to help with symptom reduction."

¶ 27    Thomas also testified to defendant's need for treatment:

"Q. Do you believe that [defendant] is able to trust people in the legal system?

A. Given his diagnosis, he will struggle with that and [that] would be something that should be addressed during the course of any treatment.

* * *

> Q. Do you believe that these delusions can be overcome simply by trying to redirect [defendant]?
>
> A. No."

¶ 28 Defense counsel moved for a directed verdict that defendant was unfit. Defense counsel did not, initially, ask the trial court to make a substantial-probability determination (as that issue was not before the *jury* and, thus, not appropriate to a directed *verdict*).

¶ 29 The State responded briefly, albeit with interruptions by defendant:

> "Your Honor, with respect to the issue of whether the defendant is fit to stand trial, the State would rest on the evidence presented.
>
> As your Honor knows, to the extent that the Court does find the defendant is unfit to stand trial, the second prong thereafter is whether there is a substantial probability that the defendant—
>
> ***
>
> [I]f provided with a course of treatment, will attain fitness within one year. And for that prong—
>
> ***
>
> Just, your Honor, the evidence has been presented by the doctor that such—he could be restored to fitness within a year."

¶ 30 Defense counsel then replied in total:

> "We still believe that [defendant] is unfit to stand trial.
>
> If the Court does agree with that finding, *we would defer to the Court* in terms of whether he could be restored within a year." (Emphasis added.)

¶ 31    As noted, defendant interrupted the State's argument. Defendant jumped back and forth between the two issues of fitness and restoration. His position was that he was not unfit, but whatever condition he did have—PTSD, in his view—could not be "cured." Also, he expressed concern that the cumulative time he has spent in custody with the aim of restoring him to fitness would soon exceed the maximum possible sentence for the charged offenses.

¶ 32    As to fitness, he stated: "I don't have persecutory delusions. *** I am not unfit. I have posttraumatic stress syndrome." As to restoration, he stated: "I can never be cured," and "They can't cure me unless they give me a chemical lobotomy."

¶ 33    As to his time spent in custody, he stated: "For the record, this case started with [12-CM]"; "I am angry. I have an attorney who is trying to put me in jail for a year *** when the maximum is six months"; "It is six months. It is a Class B misdemeanor."

¶ 34    The trial court responded to defendant's concern that he would be sent to treatment for a period exceeding the length of the  maximum sentence for a charged offense:

> "THE COURT: [Defendant], you are charged with resisting or obstructing a peace officer. That is a Class A misdemeanor in the [17-CM]. That is punishable by up to one year in the—
>
> THE DEFENDANT: I am charged with a Class B trespassing and a Class ***C assault.
>
> THE COURT: And you are also charged with resisting or obstructing a peace officer. So that is the end of that argument.
>
> THE DEFENDANT: And I am also charged with what?
>
> THE COURT: Resisting or obstructing a peace officer in [17-CM]—

THE DEFENDANT: I already served 8 months on that. And on [12-CM], I served 11 months. ***.”

¶ 35    Defendant then asked to testify, assuring the court that he would "calm down for the jury." The court denied defendant's request to testify. Citing *People v. Holt*, 2014 IL 116989, it explained that defense counsel was permitted to take a position on fitness different from a defendant's personal position. Citing *People v. Wilber*, 2018 IL App (2d) 170328, it explained that the State, for ethical reasons, may refrain from attempting to meet its burden to prove that a defendant is fit.

¶ 36    The trial court granted defense counsel's motion for a directed verdict that defendant was unfit. As to whether there was a substantial probability that defendant would attain fitness within one year if treated, the court found:

"The Court also, based on the testimony of Dr. Thomas, makes a finding that there is—exists a substantial probability that the defendant, if provided a course of treatment, will attain fitness within one year.

Dr. Thomas also testified that it is her belief and her opinion that that treatment would only be facilitated through an inpatient treatment facility.

And so at this time, I am going to find pursuant to 725 ILCS 5/104-17(a) that inpatient treatment is the least physically restrictive form of treatment therapeutically appropriate and consistent with the treatment plan. And I will remand the defendant to the custody of the Department of Human Services ***.”

¶ 37    In its written order, the trial court further ordered that the Department of Human Services shall provide the court with a written evaluation assessing the chosen facility's capacity to provide appropriate treatment for defendant and indicating its opinion as to the probability of defendant's attaining fitness. 725 ILCS 5/104-17(e) (West 2018).

¶ 38 On December 27, 2019, the Department of Human Services issued the section 104-17(e) report. It concluded: "With appropriate treatment, [defendant] is likely to attain competency to stand trial within one year of the original date of unfitness, 11/19/[19]. Chester Mental Health Center has the capacity to provide appropriate treatment." This appeal followed.

¶ 39                                    II. ANALYSIS

¶ 40 On appeal, defendant argues that the evidence did not support the trial court's determination that there was a substantial probability that he would attain fitness within one year if treated. He argues that both the trial court and defense counsel erred, resulting in a denial of due process. On the part of the trial court, defendant complains that, in the context of a directed verdict on the issue of fitness, the court merely "adopted Thomas's conclusory statement that restoration within [one] year was possible," which was unsupported by the evidence. As for defense counsel, defendant complains that she rendered ineffective assistance by failing to argue, or even consider, that it was unlikely that he would attain fitness within one year, such that defendant would be positioned to move for a discharge hearing pursuant to sections 104-23 and 104-25 (*id.* §§ 104-23, 104-25).

¶ 41 Defendant explains that the trial court's substantial-probability determination implicated his due process rights. Section 104-17(e) of the Code of Criminal Procedure of 1963 provides that a substantial-probability determination must be made with certain time limitations in mind. *Id.* § 104-17(e). For a felony, there must be a substantial probability that the defendant will attain fitness within one year of the finding of unfitness. *Id.* For a misdemeanor, there must be a substantial probability that the defendant will attain fitness within the time equal to the maximum sentence he could receive if convicted of the most serious offense with which he was charged. *Id.* Here, the most serious offense was a Class A misdemeanor, punishable by up to one year in jail.

¶ 42 Defendant notes that he has undergone multiple periods of involuntary, court-ordered inpatient treatment that, in total, exceed one year. Defendant counts that, as of November 19, 2019, the date of the fitness hearing, he had spent a total of 324 days in custody for fitness restoration in 12-CM and 246 days in custody for fitness restoration in 17-CM. As of March 13, 2020, the date the record on appeal was filed, defendant had spent an additional 115 days in custody for fitness restoration, bringing the total in 12-CM to 439 days (well over one year), the total in 17-CM to 361 days (effectively one year), and the total in 19-CM to 115 days (when the maximum possible sentence for the more serious of those charges was six months). Defendant points this court to the Kane County Judicial Portal and notes that this court can take judicial notice of information on the circuit court's website. *People v. Young*, 355 Ill. App. 3d 317, 321 n.1 (2005). The State does not dispute defendant's tally.

¶ 43 Defendant cites *Jackson v. Indiana*, 406 U.S. 715, 731 (1972), which held that an unreasonably lengthy commitment period to achieve fitness violated the defendant's right to due process. In *Jackson*, the defendant was charged with two counts of misdemeanor theft totaling $9. *Id.* at 717. The trial court determined that the defendant, a person who was deaf and mute and who functioned at the level of a preschool-aged child, was unfit to stand trial in that he was unable to assist in his defense. *Id.* at 717-18. None of the evidence suggested that the defendant's condition would ever improve such that he would be able to assist in his defense. *Id.* at 718-19. The trial court remanded the defendant to the Indiana Department of Health, until the Department could certify his competency to stand trial (which was comparable to fitness to stand trial under Illinois law). *Id.* at 719. Defense counsel appealed, arguing, *inter alia*, that the defendant's commitment under the circumstances amounted to a " 'life sentence' " without ever having been convicted of a crime. *Id.* The Supreme Court agreed, determining that due process precluded a defendant from

being held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain fitness. *Id.* at 738. It further stated that, even if it is determined that the defendant will probably be fit to stand trial soon, the defendant's "continued commitment must be justified by progress toward that goal." *Id.*

¶ 44   Defendant recognizes that *Jackson* involved a single commitment period of indefinite length, whereas the instant case involves a series of restoration attempts with, in his view, no actual progress toward making him fit for trial. Defendant also recognizes that the Illinois statutory provisions addressing fitness, specifically section 104-17(e), meet the broad directive set forth in *Jackson* that a defendant's time spent in custody for fitness restoration cannot exceed the reasonable period of time necessary to determine whether there is a substantial probability that he will attain fitness in the future. 725 ILCS 5/104-17(e) (West 2018) (restoration period cannot exceed one year). Notwithstanding, defendant argues that the instant pattern of treatment and restoration has had the same practical effect as a single indefinite term of commitment prohibited in *Jackson*. He contends that, given his pattern of failing to remain fit long enough to stand trial and the cumulative length of his commitments to achieve fitness, defense counsel should have argued, and the trial court should have considered, that there was *not* a substantial probability that he would be restored to fitness.

¶ 45   The State responds that defense counsel exercised a valid trial strategy when she declined to argue that there was not a substantial probability that defendant would attain fitness within one year. It further responds that Thomas's testimony on the issue was not conclusory and that the trial court's finding that defendant would be restored to fitness within a year was not against the manifest weight of the evidence. On the whole, we disagree with the State, and we agree with defendant.

¶ 46    In evaluating defendant's arguments, we note initially that ineffective-assistance claims are evaluated under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under *Strickland*, counsel is ineffective if (1) counsel's performance fell below an objective standard of reasonableness and (2) the defendant was prejudiced as a result of counsel's performance in that there is a reasonable probability that the result would have been different but for counsel's error. *Id.* at 687-88, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Defense counsel has wide latitude in making tactical decisions, our scrutiny of counsel's performance must be highly deferential, and there is a presumption that counsel's conduct was the product of sound trial strategy. *Id* at 689. Notwithstanding, we conclude that defense counsel did not exercise any strategy but, rather, failed to take the basic steps necessary to ensure that the trial court properly considered the substantial-probability issue. Had counsel done so, there is a reasonable probability that the trial court would have determined that there was not a substantial probability that defendant would attain fitness.

¶ 47    Also, a trial court's fitness determination will not be reversed unless it is against the manifest weight of the evidence. *People v. Haynes*, 174 Ill. 2d 204, 226 (1996). A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident, *or* the determination is unreasonable, arbitrary, or not based on the evidence presented. *People v. Shipp*, 2015 IL App (2d) 130587, ¶ 28. In this case, the trial court's choice was not between diametrically opposed possibilities: "yes," there is a substantial probability that defendant will attain fitness or, "no," there is not. Instead, because "unable to determine" was also a possible conclusion, it is more appropriate to consider whether the trial court's conclusion was unreasonable, arbitrary, or not based on the evidence. As we set forth below, it is apparent that the trial court did not consider the

basis for Thomas's opinion on the substantial-probability issue and instead merely accepted her ultimate conclusion.

¶ 48                               A. The Fitness Statute

¶ 49    A defendant is initially presumed to be fit to stand trial or to plead, and be sentenced. 725 ILCS 5/104-10 (West 2018). "A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." *Id.* In this case, defendant was found unfit because he was unable to assist in his defense.

¶ 50    Defense counsel, the State, or the trial court may raise a *bona fide* doubt as to a defendant's fitness. *Holt*, 2014 IL 116989, ¶ 52. The court may order an expert to perform an examination of the defendant. 725 ILCS 5/104-11(b) (West 2018). The expert will submit a report to the court. *Id.* § 104-15. The report shall include a diagnosis, an explanation of how that diagnosis was reached, and an opinion as to the defendant's fitness to stand trial. *Id.* § 104-15(a). If the report indicates that the defendant is not fit, the report will include an opinion as to the likelihood of the defendant attaining fitness. *Id.* § 104-15(b). If the person preparing the report is unable to form such an opinion, the report shall state the reasons therefor. *Id.* If the court agrees that there is a *bona fide* doubt as to the defendant's fitness, it conducts a fitness hearing. Id. §§ 104-11(c), 104-16. At the fitness hearing, the State has the burden of proving the defendant fit by a preponderance of the evidence. *Id.* § 104-11(c). However, the court may also call its own witnesses and conduct its own inquiry. *Id.*

¶ 51    If the court determines that a defendant is unfit, it must then determine whether there is a substantial probability that the defendant will attain fitness within one year if treated. *Id.* § 104-16(d). Further:

"If the court or the jury finds that there is not a substantial probability, the court shall proceed as provided in Section 104-23. If such probability is found or if the court or the jury is unable to determine whether a substantial probability exists, the court shall order the defendant to undergo treatment for the purpose of rendering him fit. In the event that a defendant is ordered to undergo treatment when there has been no determination as to the probability of his attaining fitness, the court shall conduct a hearing as soon as possible following the receipt of the report filed pursuant to [section 104-17], unless the hearing is waived by the defense, and shall make a determination as to whether a substantial probability exists." *Id.*

¶ 52    Section 104-23, in turn, provides that,

"[u]pon a determination that there is not a substantial probability that the defendant will attain fitness within the time period set in subsection (e) of Section 104-17 of this Code from the original finding of unfitness, a defendant or the attorney for the defendant may move for a discharge hearing pursuant to the provisions of Section 104-25." *Id.* § 104-23(a).

Further, if at any time the court determines that there is not a substantial probability that the defendant will attain fitness within the relevant time period, or if the defendant has not in fact attained fitness at the end of the relevant time period, the State shall request the court to (1) set the matter for a discharge hearing pursuant to the provisions of section 104-25, (2) release the defendant from custody and dismiss with prejudice the charges against him, or (3) remand the defendant to the custody of the Department of Human Services and order a hearing to be conducted pursuant to the provisions of the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-100 *et seq.* (West 2018)). 725 ILCS 5/104-23(b) (West 2018).

¶ 53    Section 104-17, in turn, provides:

"Within 30 days of entry of an order to undergo treatment, the person supervising the defendant's treatment shall file with the court, the State, and the defense a report assessing the facility's or program's capacity to provide appropriate treatment for the defendant and indicating his opinion as to the probability of the defendant's attaining fitness within a period of time from the date of the finding of unfitness. For a defendant charged with a felony, the period of time shall be one year. For a defendant charged with a misdemeanor, the period of time shall be no longer than the sentence if convicted of the most serious offense." *Id.* § 104-17(e).

¶ 54                B. Each Party's Respective Role in a Fitness Proceeding

¶ 55    "That the matter of fitness is a preeminent consideration in criminal proceedings—and not necessarily dictated by adversarial considerations—is evinced by the fact that the issue of defendant's fitness 'may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial.' " *Holt*, 2014 IL 116989, ¶ 52 (quoting 725 ILCS 5/104-11(a) (West 2010)). As such, any of the three participants may raise the issue of the defendant's fitness. *Id.* Each entity plays a part in ensuring that the fitness proceeding comports with due process and culminates in a fair result. While the State has the burden to prove a defendant fit, it may refrain from doing so, for ethical reasons. *Wilber*, 2018 IL App (2d) 170328, ¶ 13. This is because the State should not seek to convict an unfit defendant; doing so would deprive the defendant of due process of law. *Id.*

¶ 56    The trial court may play a more active role in fitness proceedings as compared to traditional adversarial proceedings: "[t]he court should not be passive, but active in making the assessment as to fitness [that] the law requires." *People v. Thompson*, 158 Ill. App. 3d 860, 865 (1987). The

question of a defendant's fitness is of a "constitutional dimension," and the trial court must conduct a meaningful fitness hearing by demonstrating an affirmative exercise of judicial discretion. *People v. Contorno*, 322 Ill. App. 3d 177, 179 (2001). To comport with due process, the court may not merely accept the parties' stipulation to the expert's ultimate conclusion. See *People v. Cook*, 2014 IL App (2d) 130545, ¶¶ 14, 17. Similarly, a court must evaluate the basis for the expert's opinion and may not merely rely on the expert's ultimate opinion. *Contorno*, 322 Ill. App. 3d at 179. In some cases, there may be a "fine line" between performing an active, independent assessment and accepting a stipulation as to the expert's ultimate conclusion. See *Thompson*, 158 Ill. App. 3d at 864. A court generally satisfies due process where it makes clear that it has reviewed the reports to which the parties stipulated and/or by demonstrating on the record that it has had the opportunity to observe and question the defendant. See, *e.g.*, *Cook*, 2014 IL App (2d) 130545, ¶¶ 17-20 (citing *People v. Robinson*, 221 Ill. App. 3d 1045, 1050 (1991) (trial court asked defendant on the record if she was taking her medication)).

¶ 57    Defense counsel, too, must engage in an active and independent assessment of the defendant's fitness. *Holt*, 2014 IL 116989, ¶ 52. When a *bona fide* doubt is raised as to the defendant's fitness before trial, but the defendant makes known that he, personally, desires to be deemed fit and participate in a trial, defense counsel should not blindly advocate for her or his client's expressed position. *Id.* ¶ 51. Rather, it is counsel's duty to independently assess whether her or his client is fit to stand trial and to take appropriate action upon that assessment. *Id.* ¶ 52. Counsel's duty in the context of a fitness hearing is not to advocate for a finding of fitness versus unfitness, but to take all the necessary steps to ensure a fair determination of the issue. *People v. Brown*, 31 Ill. 2d 415, 418 (1964).

¶ 58                                    C. The Instant Proceedings

¶ 59      With these principles in mind, we turn to the instant proceedings. We are mindful that, whereas *Thompson*, *Holt*, and *Wilber* concerned the trial court's *fitness* determination, the instant case concerns the trial court's *substantial-probability* determination. As observed by the supreme court in *Holt*, there is a paucity of case law delineating each party's duties in the context of a fitness hearing. Here, we determine that the principles set forth in *Thompson*, *Holt*, and *Wilber*—requiring the State, the trial court, and defense counsel to independently assess the defendant's fitness and seek a result that protects his or her right to due process—continue through the substantial-probability portion of the fitness hearing. In support, we first note that the legislature has deemed the substantial-probability determination important enough to have either the jury or the trial court make the determination. See 725 ILCS 5/104-16(d) (West 2018). Second, we observe that the *Holt* court relied extensively on defense counsel's performance during the substantial-probability portion of the fitness hearing in concluding that defense counsel provided effective assistance at the fitness hearing. *Holt*, 2014 IL 116989, ¶¶ 35-38. It explained that, throughout the proceedings, defense counsel had acted with an aim to test the reliability of the expert's evaluative process. *Id.* ¶ 50. During the substantial-probability portion of the hearing in particular, defense counsel had extensively cross-examined the expert on the issue of inpatient versus outpatient treatment and "argued forcefully" for outpatient treatment. *Id.* ¶¶ 35-38. Finally, we agree with defendant that the trial court's substantial-probability determination impacts a defendant's due process rights to the extent that it can dictate whether a defendant is remanded to custody for the purposes of attaining fitness or may be granted a discharge hearing. For these reasons, we determine that the principles set forth in *Thompson*, *Holt*, and *Wilber* delineating each party's role and duties in a fitness hearing continue through the substantial-probability portion of the fitness hearing.

¶ 60    Here, defense counsel does not appear to have given much, if any, consideration to the substantial-probability issue. At the close of the State's case, defense counsel moved for a directed verdict in favor of an unfitness finding. Though she urged the trial court to find defendant unfit, she did not ask the court to make a substantial-probability determination at that stage. Instead, after the *State* raised the substantial-probability issue, defense counsel abdicated her responsibility to the trial court, stating "*we would defer to the Court* in terms of whether he could be restored within a year." (Emphasis added.) Defense counsel made this statement notwithstanding the insufficient evidence in the record for such a determination. During direct examination, Thomas did not testify to the basis for her opinion on *defendant's* probability of attaining fitness; rather, she merely noted what occurs for the typical defendant:

> "[T]ypically, with fitness restoration, once someone has been found unfit to stand trial, they are either put into an outpatient facility or inpatient facility where they receive treatment to address the deficit they are presenting with. That could be knowledge about their criminal case; that could be knowledge about the court system in general; that could be medication management, behavior modification, or symptom reduction. So that would be the purpose of restoration."

During cross-examination, defense counsel did not ask Thomas to elaborate as to defendant's likelihood, as opposed to a typical defendant's likelihood, of attaining fitness. Defense counsel *did* elicit from Thomas her opinion that defendant's symptoms were unlikely to go away *without* treatment. This question was aimed at establishing defendant's *current* state of unfitness. Defense counsel did not follow through and ask whether defendant's symptoms were likely to go away *with* treatment or, for that matter, how long the restoration process would take. Further, defense counsel did not ask Thomas *why* she believed that defendant was likely to attain fitness if treated. In failing

to ask Thomas why she believed that defendant was likely to attain fitness if treated, defense counsel failed to take the steps necessary to ensure a fair determination of the issue, especially given the number of times defendant's restoration efforts had failed and the cumulative time defendant had spent in custody attempting to achieve restoration. See *Brown*, 31 Ill. 2d at 418. This is in contrast to defense counsel's performance in *Holt*, where defense counsel thoroughly cross-examined the expert and repeatedly tested the reliability of the expert's evaluation process. *Holt*, 2014 IL 116989, ¶ 50.

¶ 61    Also, at the time she moved for the directed verdict, defense counsel made no argument as to whether defendant was likely to attain fitness within one year. Defense counsel's performance on this point is again in stark contrast to defense counsel's performance in *Holt*, where counsel "argued forcefully" for outpatient treatment, underscoring favorable aspects of the expert's testimony that she had elicited during cross-examination and citing statutory authority. *Id.* ¶ 38.

¶ 62    Defense counsel's failure to form an independent assessment of the substantial-probability determination and its consequences is particularly concerning here, because defendant himself attempted to put the issue before the court. Defendant reminded both defense counsel and the court that he had been waiting more than seven years to face misdemeanor charges and that he had endured repeated periods in custody to attain fitness that, in total, would soon exceed the maximum sentences he faced if convicted. As to his frustration with not being able to face his charges, he stated: "For the record, this case started with [12-CM]." As to his repeated periods in custody, he stated: "[I]n [12-CM], I served 11 months." Moreover, although he believed himself to be fit, he stated that his condition was not likely to improve: "I can never be cured." These comments by defendant should have alerted defense counsel to consider, independently assess, and put

information before the court on the issue of whether there was a substantial probability that defendant would, in fact, attain fitness within one year.

¶ 63     Had defense counsel acted with an aim to test the reliability of Thomas's evaluative process, there is a reasonable probability that the results of the proceedings would have been different. Indeed, Thomas's opinion was ripe for challenge. As Thomas acknowledged, she had met with defendant only a handful of times over several years and had been unable to conduct a formal evaluation. She had never spent more than an hour with defendant and had never treated defendant. In November 2017, Thomas met with defendant when defendant went to make an appointment for a fitness evaluation. However, defendant soon left when he learned that the interaction would not be recorded. In July 2018, Thomas briefly met with defendant at the jail, before he terminated the interview due to his incorrect belief that he had a lawsuit pending against her. Thomas was again unable to meet with defendant in conjunction with the fourth fitness hearing, though she did observe him in recent court proceedings. Certainly, a defendant's refusal to cooperate with the person conducting the fitness evaluation may be admissible as evidence of his mental condition. See 725 ILCS 5/104-15 (West 2018). Similarly, a defendant's *perpetual* refusal to cooperate may be relevant to the question of whether there is a substantial likelihood that he will attain fitness within one year.

¶ 64     Indeed, we note that Thomas also testified at the second fitness hearing for 17-CM that defendant could be restored to fitness. Her testimony there was also conclusory, and the jury rendered an "unable to determine" substantial-probability determination. At the third fitness hearing for 12-CM, the trial court determined that there was a substantial probability that defendant would attain fitness, *but* this finding was based on the parties' stipulation to Thomas's testimony at the second fitness hearing from which the jury had been unable to determine the probability that

defendant would attain fitness. At some point, defense counsel must consider the possibility that defendant is *not* capable of attaining fitness and consider the paths that follow from *that* conclusion, namely, a discharge hearing.

¶ 65    The State's arguments that defense counsel acted reasonably do not persuade us. The State, citing *Holt*, begins by noting that defense counsel at a fitness hearing is not obligated to take the position of her or his client on the issue of fitness. See *Holt*, 2014 IL 116989, ¶ 56. It argues by analogy that, therefore, defense counsel acts reasonably when she or he defers to the trial court on the issue of whether there is a substantial probability that the defendant will attain fitness within one year. This analogy, however, fails. The reason that defense counsel at a fitness hearing is not obligated to take the position of her or his client is that it is her or his duty to *independently* assess her or his client's fitness and act upon her or his assessment. See *id.* ¶ 52. A duty to make an independent assessment cannot be satisfied by deferring to the court, which, here, otherwise lacked evidence to make the determination in the first place.

¶ 66    The State next argues that defense counsel exercised a valid trial strategy when she declined to argue that there was not a substantial probability that defendant would attain fitness within one year. The State reasons:

> "The only available strategies were to seek a finding that there was a substantial probability that defendant could attain fitness within one year or to seek that the trial court find that no substantial probability existed. However, there was no evidence to support the latter approach. All expert testimony finding defendant unfit to stand trial also found that there was a substantial probability that defendant could attain fitness within one year."

This argument misses the point that the reason there was no evidence to support "the latter approach" was that defense counsel failed in her duty to take necessary steps to ensure a fair

determination of the issue by putting the relevant information before the court. Defense counsel did not ask Thomas to elaborate on her conclusory opinion that defendant would attain fitness.

¶ 67    The State further argues that it would have been poor trial strategy to seek a discharge hearing, because, depending upon the outcome of the discharge hearing, the State could have petitioned for an involuntary civil admission under the Mental Health and Developmental Disabilities Code and the Code of Criminal Procedure. See 725 ILCS 5/104-25 (West 2018) (discharge hearing); 405 ILCS 5/3-701 (West 2018) (involuntary civil admission). Defendant disagrees that an involuntary civil admission would place him in a worse position than that in which he currently sits. He notes that "the State's argument ignores that a discharge hearing is the only way for a chronically unfit defendant to challenge the criminal charges brought against him."

¶ 68    We decline to comment on which strategy was more reasonable. The point is that defense counsel did not exercise either strategy. The State tries to show that a discharge hearing could have resulted in a poor outcome for defendant, but it fails to appreciate that defense counsel did not seek to avoid this supposedly poor outcome. Rather, defense counsel merely deferred to the court. Defense counsel did not form an independent assessment as was her duty.

¶ 69    We recognize that section 104-16 allows for the possibility that the trier of fact will be "unable to determine" whether there is a substantial probability that a defendant will attain fitness within one year. As a logical corollary, it is possible that defense counsel would be unable to determine whether there is a substantial probability that the defendant will attain fitness within one year. However, this permissible conclusion should not be reached until *after* defense counsel has taken the steps necessary to discover the relevant information, to cross-examine the witnesses, and to consider which outcome may be advantageous to her or his client given the particular circumstances of her or his client's case.

¶ 70     In this case, defense counsel's failure to take the steps necessary to ensure a fair determination of the issue resulted in the trial court's corresponding failure to give the issue due consideration. The trial court has fallen on the wrong side of the "fine line" referenced in *Thompson* between merely accepting the parties' stipulation as to the expert's conclusion and performing its own, independent assessment of the issue. Again, the State prompted the court to rule on the issue by arguing only that "the evidence *** presented by the doctor [was] that [defendant] could be restored within a year." Defense counsel did not argue the issue, stating merely that she would defer to the court on the issue. The court then ruled that there was a substantial probability that defendant would attain fitness within one year, "based on the testimony of [Thomas]." However, Thomas testified only in conclusory terms. As such, the trial court could not have evaluated the *basis* for Thomas's opinion, instead just accepting her ultimate conclusion that there was a substantial probability that defendant would attain fitness within one year. See *Contorno*, 322 Ill. App. 3d at 179.

¶ 71     The State disagrees that Thomas's substantial-probability testimony was conclusory. It notes that Thomas testified that antipsychotic medication could help defendant's condition. However, the testimony to which the State cites comes from Thomas's testimony at the second restoration hearing, *not* the fourth fitness hearing at issue. At the fourth fitness hearing, Thomas did not reference her testimony from the second restoration hearing that antipsychotic medication could help defendant's condition or that such medication would work again.

¶ 72     The State also disagrees that the trial court considered the issue in a cursory manner. It states that the trial court "considered changes in defendant's behavior; at one court proceeding, noting that defendant's behavior had dramatically improved, and at another hearing, the court cited the opinion of Dr. Olenek that defendant's behavior had 'much improved' after his Amitriptyline

medication dosage was doubled." However, this commentary, *again*, comes from testimony at the second restoration hearing, *not* the fourth fitness hearing at issue. Moreover, Olenek gave this testimony in the context of opining that defendant was then fit to stand trial, a position opposite to that reached by the trial court in the fourth fitness hearing.

¶ 73    Indeed, we note that the State devotes much of its brief to the testimony and evidence elicited at prior hearings where the trial court determined that there was a substantial probability that defendant would attain fitness. It notes that, each time defendant has been found unfit, at all four fitness hearings and at the second restoration hearing, the court also determined that there was a substantial probability that defendant would attain fitness within one year. It also notes that, on two separate occasions, at the first and third restoration hearings, defendant had been found restored to fitness. However, it remains that, for more than five years, defendant has never been fit long enough to stand trial for the misdemeanor charges against him. At some point, the court must at least question rather than summarily accept the reliability of its prior substantial-probability and restoration determinations. In any event, the court stated for the record that the basis for its substantial-probability determination was not, in fact, evidence from past hearings or its own past findings, but Thomas's testimony, which, as we have discussed, was conclusory. Accordingly, there was insufficient evidence to support, and the court abused its discretion in finding, a substantial probability that defendant would attain fitness within one year.

¶ 74    Finally, we observe that more than one year has passed since November 19, 2019, when the trial court determined that defendant was unfit and that there was a substantial probability that defendant would attain fitness within one year. The State has not raised a mootness argument, though it is likely that the circumstances of this case are capable of repetition yet evade review. See, *e.g.*, *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998). We do not know from this record whether

defendant has since been rendered fit, whether defendant has received a discharge hearing, or if there has otherwise been a disposition on defendant's case. We do know, however, that defendant has faced multiple periods of custody attempting to achieve fitness to face misdemeanor charges going back as far as 2012.

¶ 75    If defendant has since been restored to fitness, no remedy is needed. If defendant has not been restored to fitness within the relevant period, we trust that the State has taken appropriate action under section 104-23(b) (725 ILCS 5/104-23(b) (West 2018)). In the future, defense counsel, the State, and the trial court are to give the issue of the substantial probability of defendant attaining fitness full and fair consideration.

¶ 76                                      III. CONCLUSION

¶ 77    For the reasons stated, we reverse the trial court's finding that it was substantially probable that defendant would attain fitness within one year and remand for proceedings consistent with this opinion.

¶ 78    Reversed and remanded.

---

**No. 2-20-0025**

---

| | |
|---|---|
| **Cite as:** | *People v. Corbett*, 2022 IL App (2d) 200025 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, Nos. 12-CM-5438, 17-CM-1492, 19-CM-2345; the Hon. Salvatore LoPiccolo Jr., Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Erin S. Johnson, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Leslie Martin, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---