NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 230668-U

NO. 4-23-0668

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 1, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| MICHELLE N. MORENO, | ) | No. 18CF291 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Doherty and DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) Defendant failed to establish the trial court committed a clear or obvious error in its application of the burden of proof.

(2) The trial court's determination defendant was fit to stand trial was not against the manifest weight of the evidence.

(3) Defendant forfeited her arguments the trial court abused its discretion in allowing the State to introduce out-of-court statements made by the victim to two different police officers on two different occasions prior to the night of the victim's death.

¶ 2   On May 3, 2023, after a bench trial, the trial court found defendant, Michelle N. Moreno, guilty of two counts of first degree murder, which merged, and one count of aggravated domestic battery. On July 12, 2023, the court sentenced defendant to 35 years in prison, to be followed by 3 years of mandatory supervised release. On appeal, defendant raises three issues: (1) her first degree murder conviction should be reversed because the court erroneously shifted the

burden of proof to her on her self-defense claim, (2) the court erred by finding she was fit to stand trial, and (3) the court erred by allowing the State to introduce the alleged victim's prior statements, which were related to his prior arrests for physically abusing defendant, because they undermined her defense. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On March 27, 2018, the State charged defendant with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)) and one count of aggravated domestic battery (*id.* § 12-3.3(a)). The charges were related to the death of Stanley Seawood, who was 65 years of age. On April 11, 2018, a grand jury indicted defendant on the same charges.

¶ 5                                 A. Fitness Proceedings

¶ 6        On May 10, 2018, the trial court entered an order referring defendant to Dr. Philip Pan for a fitness examination. Later that month, Dr. Pan diagnosed defendant with schizoaffective disorder, bipolar type. The doctor noted defendant demonstrated a fair understanding of the purpose and nature of the proceedings but "exhibited significant psychotic thinking and disorganization," had been unable "to produce a coherent personal account" of what transpired, and was unable to assist her attorney in her defense. Dr. Pan indicated defendant should be remanded to a secure, forensic hospital where she could be treated with antipsychotic and mood-stabilizing medication. With such treatment, Dr. Pan anticipated defendant could be restored to fitness within a year.

¶ 7        On May 21, 2018, the trial court entered an order, finding defendant was not fit to stand trial and ordering her placed in the custody of the Illinois Department of Human Services (DHS) for inpatient treatment in a secure setting. In a letter to the court dated June 8, 2018, DHS anticipated defendant would be admitted to Elgin Mental Health Center (Elgin) and indicated a

substantial probability existed defendant would be fit for trial within one year.

¶ 8        On September 6, 2018, the forensic court services director at DHS informed the trial court that defendant was fit to stand trial. According to a progress report prepared by Dr. Mirella Susnjar, a psychiatrist, Dr. Sandra Story, a clinical psychologist, and Elizabeth Martinez, a social worker, the treatment team at Elgin, who had been clinically observing defendant for approximately 90 days, agreed defendant appreciated the nature and purpose of the proceedings against her and could assist in her defense. The treatment team opined defendant was feigning a lack of legal knowledge and attempting to "feign a psychiatric condition as evidenced by brief and fleeting instances" where she whispered to herself and had rambling speech.

¶ 9        On October 6, 2018, Dr. Pan interviewed defendant for approximately 45 minutes at the Sangamon County Detention Facility. While he diagnosed her with schizoaffective disorder, bipolar type, Dr. Pan believed she demonstrated an adequate understanding of the proceedings and was able to assist her attorney in her own defense.

¶ 10       Later that month, the trial court appointed Dr. Terry M. Killian, a psychiatrist, to evaluate defendant's fitness. Dr. Killian's psychiatric evaluation was filed with the court on December 14, 2018. Within a reasonable degree of psychiatric certainty, he opined defendant was fit to stand trial.

¶ 11       Later that summer, according to a motion filed by the State on July 5, 2019, Dr. Pan concluded on June 23, 2019, defendant was not fit to stand trial. In accordance with section 104-13 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104-13 (West 2018)), the State sought an independent examination of defendant by Dr. Killian, which the trial court ordered on July 8, 2019.

¶ 12       On October 15, 2019, defendant's attorney filed a psychiatric report prepared by

Dr. Jean Clore, PhD, and Dr. Ryan Finkenbine, MD, dated September 27, 2019. Both doctors evaluated defendant's fitness to stand trial at the request of the Sangamon County Public Defender's Office and believed defendant was not fit to stand trial as of September 9, 2019, but likely would be competent to stand trial within 12 months. However, the doctors indicated she needed to be treated at an inpatient facility to determine if she needed a higher dose of antipsychotic medication, augmentation strategies, or an alternate antipsychotic medication. They did not agree defendant was malingering. According to their report:

"At the time of our interview, the most important finding against the presence of malingering was the absence of some external incentive[.] Two possible incentives are avoiding trial via unfitness and being found [not guilty by reason of insanity (NGRI).] *** Regarding the first, it is unlikely that [defendant] is malingering psychiatric symptoms to avoid trial because she herself voiced a willingness and a desire to go to trial and to avoid continuances[.] She did not state she wished to avoid trial[.] Regarding the second, it is unlikely that she is malingering symptoms to be found NRGI because the weight towards legitimate symptoms far outweighs that in favor of feigned or exaggerated symptoms[.] Factors such as inconsistency in reports and the purported double denial or responsibility are both better explained by schizophrenia and histrionic personality disorder[.] That some of [defendant's] psychotic symptoms, such as disordered thought processes, abnormal affect, and social disfunction, are not severe is best explained by variations in the presentation of schizophrenia and other factors (treatment with medications and premorbid social skills, among others)[.]

[Defendant] certainly has an atypical combination of illnesses and her

presentation is unique, but these do not equate to malingering[.] The interplay between histrionic personality disorder and schizophrenia has introduced an unusual presentation that could be misunderstood as malingering[.] Many of the perceived signs of malingering are not intentional efforts to feign illness or avoid penalty, but rather are theatrical, overly emotive presentations of real psychotic symptoms[.] [Defendant's] tendency to be overinclusive, yet evasive[,] are examples of overly interpersonal familiarity and impressionistic speech (*i.e.*, symptoms of histrionic personality disorder)[.] The lack of effort to conceal or downplay mental illness, as is sometimes seen with schizophrenia, is related to her histrionic desire to be the center of attention and to 'lay it all out there[.]' Her presentation was more consistent with unintentional confabulation and over endorsement of somatic complaints typical of a personality disorder rather than malingering[.]"

¶ 13 In a fitness to stand trial evaluation dated August 1, 2020, Dr. Pan stated the evidence did not support an opinion defendant lacked an understanding of the proceedings or would be unable to assist her attorney. Dr. Pan diagnosed defendant with schizoaffective disorder, bipolar type, alcohol use disorder, cocaine use disorder, and malingering.

¶ 14 On March 26, 2021, at a hearing to determine whether defendant was fit to stand trial, the trial court recognized it previously found a *bona fide* doubt existed as to defendant's fitness and indicated the State bore the burden of production and persuasion on the question of defendant's fitness. The parties stipulated to the admission of reports prepared by Dr. Pan (People's exhibit Nos. 1-A through 1-B) and a team of individuals from Elgin (People's exhibit Nos. 2-A and 2-B).

¶ 15    The State first called Springfield Police Department (SPD) Detective Joseph Womble, who investigated Seawood's death. Womble testified defendant initially claimed she was not present and did not know what happened to Seawood. However, shortly thereafter, defendant asked whether Illinois had a self-defense law. Defendant later told the police she was, in fact, present, and she and Seawood argued about narcotics, Seawood battered her, and she defended herself against his attacks. Defendant claimed blood on her clothing belonged to both her and Seawood. While she had bruising on her elbows and a cut on her hand, Womble said defendant's version of events was unbelievable.

¶ 16    Womble testified defendant asked him if Illinois had the death penalty. Later, she asked if Illinois had an NGRI law. According to Womble, defendant appeared neither mentally ill nor under the influence of drugs and/or alcohol.

¶ 17    Dr. Killian testified as an expert in the field of psychiatric medicine. He evaluated defendant in October 2018 and July 2019. Before the first evaluation, he reviewed reports created by Dr. Pan and the staff at Elgin. While defendant was at Elgin, the staff concluded she was malingering, noting defendant's description of her psychotic symptoms was vague and inconsistent with their observations. Dr. Killian testified he made these same observations when he interviewed defendant. According to the doctor, the staff at Elgin indicated defendant acted strangely when she believed she was under observation but acted fine when she was not aware she was being observed. Further, at Elgin, defendant was given two objective tests to assess the reliability of her reported symptoms. One assessment indicated better than a 50% chance existed defendant was feigning or malingering symptoms. The other assessment strongly suggested she was malingering or feigning symptoms.

¶ 18    According to Dr. Killian's testimony, during both of his interviews with defendant,

defendant was trying to convince him that she was mentally ill. She provided descriptions of her symptoms that seemed artificial, almost as if she was reading from a diagnostic manual. Nothing in her appearance or thought process suggested she was mentally ill. Further, her answers to questions were overly elaborate and dramatic and were not consistent with her having a psychotic illness.

¶ 19          In addition, Dr. Killian noted defendant gave inconsistent responses regarding her legal knowledge. During one interview, defendant said she did not know the difference between a bench trial and a jury trial, did not know what a defendant was, and did not know what a witness was. Because of defendant's criminal history, Dr. Killian said it was not possible defendant did not know this basic information. Instead, he believed she had an adequate understanding of legal issues, fairly normal thought processes, and average intellectual functioning. While Dr. Killian could not say for sure whether defendant had a true psychotic illness, he opined she was malingering.

¶ 20          When asked about the report drafted by Dr. Clore and Dr. Finkenbine, Dr. Killian indicated defendant may display some histrionic behaviors. He could not say whether her histrionics were made up or part of her real personality. He saw defendant as being more antisocial. In both of his interviews with defendant, he concluded she was either malingering symptoms entirely or greatly exaggerating her symptoms. As noted earlier, defendant's reported symptoms lacked the detailed and nuanced character of the descriptions of someone who had actually lived with those symptoms. Defendant also reported severe symptoms in the absence of objective evidence. Further, while defendant claimed she did not commit the crime, she also said she was too crazy to know what she did if she killed Seawood. Dr. Killian noted this was significant. Dr. Killian also asserted it is rare for people who are truly unfit to repeat over and over that they are

unfit.

¶ 21 Dr. Killian testified the inconsistencies or gaps in defendant's knowledge could not be explained by psychotic illness. When asked whether his determination defendant was malingering was a "close call," Dr. Killian testified it was not close at all. Dr. Killian opined defendant was fit to stand trial.

¶ 22 Dr. Finkenbine testified as an expert witness for defendant. The report prepared by Dr. Finkenbine and Dr. Clore dated September 27, 2019, was admitted into evidence as defendant's exhibit No. 2. While Dr. Finkenbine believed defendant had a factual understanding of the legal process, he concluded she could not assist her attorney in her defense. Dr. Finkenbine observed defendant had a degree of disorganization in her thought process, which he testified is difficult to fake, and a severe inability to communicate effectively during their first interview. The doctor testified defendant clearly had mild to moderate delusions, some degree of paranoia, and some false beliefs. However, he also indicated he observed very limited support for auditory hallucinations and no support for visual hallucinations.

¶ 23 According to Dr. Finkenbine, along with defendant's disorganized thinking, her delusions were "key or critical" to her inability to assist in her defense because the delusions could interfere with her ability to mount a defense or work with her attorney to determine her best defense. Dr. Finkenbine testified some of her delusions were related to the charged offenses and what occurred in the time around the charged offenses, making it difficult for her to work with her attorney in a rational manner. For example, defendant told Drs. Finkenbine and Clore that, on the night of Seawood's death, she came out of the bathroom at her home and was attacked by 30 people. One person attacked her with an ironing board and crushed her skull. She died but then came back to life. She also said she had been stabbed 32 times in her left arm and chest and 6 times

in her abdomen. She claimed the jail lights were preventing her and the doctors from seeing scars from the wounds.

¶ 24 Along with schizophrenia, alcohol use disorder, and cocaine use disorder, Dr. Finkenbine diagnosed defendant with histrionic personality disorder. The doctor testified histrionic personality disorder is characterized by a person who is dramatic, uses impressionistic speech and language, draws attention to herself, is overly familiar, and "has a superficiality about them." Defendant displayed some of these characteristics during her interviews with him. However, Dr. Finkenbine said histrionic personality disorder does not usually make it difficult for a defendant to assist their attorney.

¶ 25 On the question whether defendant was malingering, Dr. Finkenbine opined she was not. The doctor testified a person in defendant's position would malinger to either avoid trial or to be found NGRI. According to Dr. Finkenbine, defendant said she wanted to get the case finished and did not want to be found unfit. In addition, even if he assumed she was malingering, he did not have sufficient support for that determination. The doctor then described part of his meeting with defendant that morning:

> "This morning when I asked her do you feel like the [NGRI] defense applies to you? She struggled to understand it this time, but not more than the last time. I think it's just been three years since she's been to a restoration class. I think it's just natural memory loss. She actually kind of walked through it and sort of said, you know, this might be, you know, maybe I was mentally ill; and I think, you know, I've got a lot of mental illness. I have schizophrenia. So, she's putting that part out there. But then she said that I don't want to do that, I didn't do anything, I wasn't there. She claims she wasn't present at all. This was only 20 minutes after she

explained she was there and had been severely injured. So, it didn't make sense that she was somehow pursuing an NGRI defense as an external gain."

According to Dr. Finkenbine, his diagnosis of histrionic personality disorder combined with schizophrenia better explained defendant's behavior than a conclusion she was malingering.

¶ 26 Dr. Finkenbine conceded the data provided some support for an assertion defendant was malingering. However, he stated additional information was necessary before a malingering diagnosis could be made, especially in a significant case like this one. Dr. Finkenbine saw the information differently than Dr. Killian but acknowledged data in a case like this can be viewed differently. The doctor believed defendant could be restored to fitness within 12 months. The State did not cross-examine Dr. Finkenbine.

¶ 27 Dr. Clore testified she also was retained by the Sangamon County Public Defender's Office to determine if defendant was fit to stand trial. Although Dr. Finkenbine was her boss at the University of Illinois College of Medicine, she testified she was not required to agree with his conclusions. The trial court accepted Dr. Clore as an expert witness in the field of fitness examinations. She testified she quickly detected defendant had a personality disorder after they met. She was critical of the State's reliance on the malingering assessments administered to defendant at Elgin. Dr. Clore said one test showed defendant was not malingering and the other test overidentified malingering. She believed defendant was not fit to stand trial. Once again, the State did not cross-examine the doctor.

¶ 28 Defendant did not testify at the hearing.

¶ 29 The State argued the trial court should accept Dr. Killian's opinion on defendant's fitness, noting he was "quite simply the gold standard in this county when it comes to fitness determinations." Further, the State noted the staff at Elgin indicated defendant's unusual behavior

occurred when she believed she was being watched and disappeared when she did not know she was being observed. After defendant spent two months at Elgin, her treatment team concluded she was malingering. While acknowledging Dr. Pan found defendant was not fit in June 2019, the State noted he concluded defendant was malingering in his August 2020 report.

¶ 30　　　　The State also asserted defendant seemed to have some knowledge of the law and appeared to understand the concept of self-defense when speaking to the police after Seawood's death. Two months later, while she displayed a limited understanding of legal concepts when talking to Dr. Pan, the doctor was able to successfully educate her on certain legal concepts. However, defendant's understanding of legal concepts decreased as time passed to the point where she seemed to have no understanding of basic legal terms in August 2020. The State cited Dr. Killian for the proposition a person's understanding of legal concepts does not come and go with psychosis. According to the State, defendant's professed current ignorance of legal concepts she understood before is highly indicative of malingering. Further, the State pointed to defendant's "double denial," where she claimed she wasn't present for Seawood's death but also claimed she is too mentally ill to be held responsible if she did kill him.

¶ 31　　　　The State next addressed Dr. Finkenbine and Dr. Clore's opinion defendant was not malingering, which was based on their finding defendant had no external incentive to malinger. According to the State, this finding was completely contradicted by the record. The State asked the trial court to find Dr. Finkenbine and Dr. Clore were not credible and their conclusions not reliable, defendant was malingering, and she was fit for trial.

¶ 32　　　　Defense counsel argued the State was overlooking its burden of establishing defendant could assist her attorney in her defense. According to defense counsel, defendant's delusions would make it difficult, maybe impossible, for her to assist her attorney both in preparing

for trial and during the trial. Counsel asked the trial court to find defendant remained unfit.

¶ 33 The trial court indicated it had reviewed the exhibits and considered the testimony presented. In addition, the court stated it considered defendant's knowledge and understanding of the charges; the proceedings; the consequences of a plea, conviction, and sentence; and the functions of the participants in the trial process. Further, the court noted it considered defendant's ability to observe, recollect, relate things that had occurred, and communicate with defense counsel. The court also stated it had considered her social behavior and abilities; her orientation as to time and place; her recognition of individuals, places, and things; and her motor processes.

¶ 34 As for the expert testimony presented, the trial court recognized the conflicting opinions. Based on Dr. Killian's testimony and defendant's records from Elgin, the court found the State had met its burden with regard to defendant's fitness to stand trial. According to the court, the evidence showed defendant had the ability to turn her symptoms on and off as she desired, which is not consistent with someone who suffered from clear mental illness. The court indicated it was persuaded by Dr. Killian's testimony that defendant was not delusional and, instead, was malingering.

¶ 35 As for the testimony of the defense experts, the trial court found their opinion defendant was not capable of assisting her attorney inconsistent with her ability to work with the detectives after Seawood's death. The court also concluded defendant's answers to questions regarding her understanding of the legal process were not authentic. Turning to Dr. Finkenbine's testimony defendant had no incentive to malinger, the court found this "border[ed] on the absurd." As a result, the court determined the State had met its burden of production and persuasion with regard to defendant's fitness.

¶ 36 B. Defendant's Bench Trial

¶ 37 Defendant's bench trial began on May 1, 2023. Greg Cooper, a 911 dispatcher, testified he answered a call a little after 7 a.m. on March 24, 2018. A woman, later identified as defendant, stated she came home from a night of partying and found her boyfriend, later identified as Stanley Seawood, naked, not moving, and cold to the touch. Captain Paul Byers of the Springfield Fire Department testified he responded to the 911 call. He and other firefighters found an unresponsive man with no detectable pulse on the floor, covered in a blanket. The firefighters informed the medics the man had possibly been stabbed.

¶ 38 Retired SPD Officer Timothy J. Ealey testified he was the first police officer to arrive at the scene. Defendant and a Black man were standing outside the home at 2132 East Capitol Avenue. After another officer arrived, Officer Ealey spoke with defendant. Defendant said she and Seawood were a couple and lived together at that address. Defendant told Officer Ealey she had told Seawood to stop sleeping with other women. Further, defendant claimed she had been out drinking all night and appeared intoxicated. Officer Ealey secured defendant in his squad car. According to Officer Ealey, defendant initially said she came home at 5:20 a.m. and found Seawood curled up in front of the window, then she said she came home about 6 a.m., and still later, she said she found Seawood about 20 minutes before calling 911. Defendant said she did not have a phone and had to run to various houses before she found a phone to call 911. Officer Ealey testified defendant made no statements about how Seawood died, did not say she stabbed Seawood, and did not say she had been with him the entire night.

¶ 39 Dr. Nathaniel Patterson, a forensic pathologist, testified Seawood was 65 years of age and 5 feet, 10 inches tall. He had four stab wounds (the upper right side of his chest, the right side of his lower chest, his right shoulder, and the inside of his left forearm) and numerous incised wounds and abrasions. According to Dr. Patterson, Seawood could have died within minutes of

being stabbed in the chest or lived for several hours.

¶ 40        Retired SPD Detective Lori White testified she was with the Crime Scene Services Division in March 2018 and responded to the crime scene. She found dirty paper towels that she suspected had been used in an attempt to clean up blood and fecal matter in the trash under the kitchen sink. Detective White indicated defendant did have bruises on her upper left shoulder and back by the shoulder, the center of her back, the back of her arm, and her legs. Defendant was also missing a tooth.

¶ 41        SPD Officer Kate Blankenship testified she transported defendant to the hospital after she was interviewed by detectives. Defendant had complained of shortness of breath, high blood pressure, a possible collapsed lung, a possible broken arm, burning eyes, and a stab wound. Blankenship observed a bruise on defendant's elbow and some minor scrapes on her knuckle. Defendant was treated at the hospital, discharged the same day, and taken back to the county jail.

¶ 42        Dr. Elizabeth McDaniel, an attending physician in the emergency room (ER) at HSHS St. John's Hospital in Springfield, testified defendant was brought into the emergency room on March 24, 2018, at approximately 9 p.m. Defendant complained she had been beaten the night before, was short of breath, had head trauma, and had pain in her neck, chest, abdomen, and back. She claimed someone hit her with a baseball bat and a metal rod on the front and back of her torso and her head. Defendant was able to walk into the ER and seemed to be talking and moving fine. According to Dr. McDaniel, defendant's head looked normal, with no bruising or fractures. A CT scan did not detect defendant had any swelling, internal bleeding, or fractures. The doctor also stated defendant's bruising was not consistent with being struck by a metal rod or a baseball bat. Defendant was released that night because she did not require hospitalization or surgical intervention. On cross-examination, the doctor testified she did not know what caused defendant's

- 14 -

bruising.

¶ 43      SPD Detective Joseph Womble testified he arrived at the scene at approximately 8:30 a.m. and then went to the police department to speak with defendant and Jeffrey Washington. He reviewed the 911 call from Washington and defendant and talked with Officer Ealey about Ealey's interaction with defendant. Detective Womble testified he also interviewed Robert Kelly to see if he had been with defendant on the night of the homicide. Detective Womble then interviewed defendant. A recording of the interview was admitted into evidence, with some redactions.

¶ 44      After interviewing defendant, Detective Womble went to the crime scene and learned blood had been found on several items, including a mop in the sink. Some cleaning gloves, possibly used to clean the scene, were also found. Later, Detective Womble interviewed defendant again, and she asked about an insanity defense. The detective told her he did not give legal advice and did not have much to say about her question. According to the detective, defendant's blood was found on the handle of a steak knife. Both defendant's blood and Seawood's blood was found on the handle of a serrated bread knife. Further, Seawood's blood was found on a pair of women's jeans and on an ironing board.

¶ 45      On cross-examination, Detective Womble testified defendant said there was no phone in the Seawood residence. Defendant also told the detective Seawood was hesitant to call 911 because he had an outstanding warrant and believed both an ambulance and the police would respond. Defendant told the detective both of her elbows were injured when she tried to protect herself from Seawood's assault. Detective Womble acknowledged domestic violence investigations are complicated and victims of domestic violence do not always tell the truth initially.

¶ 46    On redirect, Detective Womble testified defendant accused Seawood of hitting her with his fists, a bat, a machete, a table, and an ironing board. However, defendant's blood was not found on any of those items.

¶ 47    After the State rested, defendant called SPD Detective Evan Delude, who was a patrol officer at the time of the charged events in this case, to testify. Detective Delude stated he responded to a domestic disturbance call involving defendant and Seawood on February 21, 2018. He first met with defendant and observed she had a knot on her forehead, a missing front tooth, and a broken tooth. As a result, Seawood was arrested for domestic battery.

¶ 48    On cross-examination, Detective Delude testified he initially responded to 2103 East Capitol, where defendant was located. She was extremely intoxicated and drinking Keystone beer. She said Seawood was armed with a handgun and punched her in the face. Detective Delude then talked with Seawood, who was sober and cooperative, at 2132 East Capitol Avenue. Seawood claimed defendant came home intoxicated, became angry, jumped on his back, and bit him. While Seawood did not deny striking defendant, he showed Delude a fresh bite mark on the back of his shoulder. Seawood denied having a firearm and allowed Delude to look around his house. No firearm was found. Later, when asked by Detective Delude, defendant denied biting Seawood. Seawood was arrested for domestic battery, and defendant, due to her intoxication, was given a notice to appear for domestic battery.

¶ 49    SPD Patrol Sergeant Burton Brown testified that while he was a patrol officer on December 21, 2017, he responded to a domestic disturbance call at 2132 East Capitol Avenue. Both defendant and Seawood were present. Defendant had two fresh bite marks on her right arm. Sergeant Brown arrested Seawood for domestic battery against defendant. On cross-examination, Sergeant Brown testified Seawood admitted he bit defendant. Seawood told the sergeant he was

asleep and defendant started yelling at him and pushing him. According to the sergeant, Seawood said he got up and tried to get away from defendant, but defendant kept yelling and pushing him. Seawood said he bit defendant in an attempt to get her away from him. Sergeant Brown testified Seawood was calm and cooperative during their interaction.

¶ 50　　　　Washington testified he lived near and had known Seawood and defendant for approximately five years. He testified he had witnessed Seawood pull defendant out of a vehicle and drag her by her shirt and possibly her hair into the house. On cross-examination, Washington testified the police interviewed him on the day Seawood died but denied telling the police that he had no knowledge of any history of domestic violence between Seawood and defendant.

¶ 51　　　　Defendant attempted to call Shone Foster, but the trial court indicated Foster was not present. At defendant's request, pursuant to Illinois Rule of Evidence 804(a) (eff. Jan. 1, 2011), the court allowed Foster's prior sworn testimony from January 13, 2023, to be admitted as defendant's exhibit No. D34. The court indicated it would limit its review to the testimony it previously found relevant. At that January hearing, after listening to Foster's testimony, the trial court ruled it would not allow Foster to testify regarding Seawood allegedly sexually assaulting defendant, defendant's sexual activity, or defendant's act of running out of Seawood's house naked because Seawood was allegedly attacking her. However, the court ruled Foster could present evidence regarding the violent history of defendant and Seawood's relationship, including testimony about one incident of domestic violence Foster observed.

¶ 52　　　　Defendant chose not to testify.

¶ 53　　　　In rebuttal, Detective Womble testified he interviewed Washington on March 24, 2018. When Washington was asked whether he had seen any domestic violence between Seawood and defendant, Washington said he had seen them argue but did not see anything physical. On

cross-examination, Womble testified Washinton initially said he had seen physical violence between defendant and Seawood but later said he had not.

¶ 54　　During its closing argument, the State argued it had established defendant stabbed Seawood and caused his death. The State pointed to the various stories defendant provided the police, noting she first said she was not at the house when defendant was stabbed, provided the police with the names of two other men she indicated might have killed Seawood, said some unknown assailant or assailants may have broken into the home and stabbed Seawood, said if she killed Seawood then she must have been insane, and, finally, claimed she killed defendant in self-defense.

¶ 55　　Defense counsel argued the facts established defendant acted in self-defense and the State had the burden to prove defendant's version of events was not correct. According to defense counsel, defendant told the detectives what really happened once the detectives had earned her trust. She was being beaten by defendant, she was defenseless, and she grabbed a knife and defended herself against Seawood. Counsel asserted:

> "Judge, in order to find [defendant] guilty of First Degree Murder, you must be certain that she was not acting in self-defense. You must completely discredit her story. But her story is the only one that is plausible.
>
> The question for the Court is one of law. Were [defendant's] beliefs and actions reasonable? They absolutely were. The danger was there. He was beating her, again, on the floor of their home; and she needed to protect herself or risk losing her own life."

Defense counsel then asserted the State was arguing defendant should have just accepted the beating from Seawood. Defense counsel finished her closing argument, stating:

"Judge, I ask that you find [defendant] not guilty of all charges. But if this Court believes she acted objectively unreasonable [*sic*], then at most a finding of guilty on Second Degree Murder because the evidence is substantial to prove that she did act in self-defense. Your Honor, no woman should be forced to accept a beating. No woman should be left with a longing of having been beaten rather than defending herself, not even [defendant]."

¶ 56    The State responded the physical evidence did not support defendant's version of events. Defendant was examined at the hospital the day Seawood died. Although she claimed Seawood had attacked her with a table, an ironing board, a baseball bat, his fists, and a machete, medical professionals determined defendant had no broken bones, no swelling, no internal bleeding, and no bruising or injuries to her face. The bruising she did have was not consistent with what she said occurred that night. Further, defendant's blood was not found on the baseball bat, machete, or ironing board with which Seawood allegedly attacked defendant. While acknowledging the mutually volatile relationship between Seawood and defendant, the State argued defendant completely discredited herself with her various explanations of what happened between her and Seawood.

¶ 57    After a brief recess, the trial court stated it had considered the appropriate evidence, made factual determinations, and applied the law to those facts. The court then stated:

"Court starts by ruling that the offense of First Degree Murder has been proven by the State's evidence beyond a reasonable doubt. All of the elements, specifically that [defendant] armed herself with a knife and knowingly, intentionally, either/or, Court finds at least knowing conduct that caused or created a strong probability of death or in the minimum, great bodily harm, as evidenced

by the multiple stab wounds, use of significant force to penetrate on a couple of those wounds five inches deep into the body of the deceased.

Then the Court is tasked with taking the evidence presented further and finding that some evidence was presented for this Court to consider a self-defense claim from Defendant \*\*\*. And in considering that evidence, then it's one of the rare circumstances in our criminal justice system where the burden then shifts and the Defendant has a burden to establish by a preponderance of the evidence that all the elements of a self-defense claim have been met."

The court noted defendant had established she and Seawood had a volatile relationship, including a mutual history of violence. Further, the court noted defendant had some injuries after the events in this case, including some bruising on her back, elbow, and legs. However, the court pointed to the "circuitous route" defendant took to claiming she acted in self-defense, which was neither her first defense nor her last defense. According to the court, nothing supported defendant's self-defense claim other than her own words, which were tainted by the multiple different statements she made as to what happened.

¶ 58        Further, even if defendant had consistently and from the beginning claimed she acted in self-defense, the trial court stated the physical evidence did not support her version of events. According to the court:

"You cannot have what happened to you in life, you cannot have what was described by [defendant] happen to you, get smacked on the head repeatedly with an ironing board, smacked around the body with baseball bats, wooden items, a table; and the only blood that you have to show for it is a puncture wound that looks like you grabbed a knife inappropriately or a cut on your hand."

Further, the court stated it did not believe the defendant's version of events and found she was not in immediate harm when she repeatedly stabbed Seawood. The court then found defendant guilty of both first degree murder and aggravated domestic battery.

¶ 59        On May 11, 2023, defendant filed a motion to vacate her conviction or receive a new trial. On July 12, 2023, the trial court denied defendant's motion and sentenced her to a 35-year term of imprisonment. On July 18, 2023, defendant filed a motion to reduce her sentence, which the court denied.

¶ 60        This appeal followed.

¶ 61                                    II. ANALYSIS

¶ 62                                   A. Burden of Proof

¶ 63        Defendant first argues her conviction should be reversed because the trial court applied the wrong burden of proof when finding her guilty of first degree murder. According to defendant, the court believed it was her burden to show she acted in general self-defense when she killed Seawood. Defendant does not specifically refer to either general self-defense or imperfect self-defense. However, for purposes of clarity in our decision, we will do so.

¶ 64        During her trial, defendant's attorney made two different self-defense arguments. Essentially, defense counsel first argued defendant acted in general self-defense. As a result, according to defense counsel, defendant's intentional act of killing Seawood was fully justified under the law, and the trial court should acquit defendant. In the alternative, assuming, *arguendo*, the court found defendant did not act in general self-defense, defense counsel argued defendant should only be found guilty of second degree murder, instead of first degree murder, because she acted in imperfect self-defense.

¶ 65        In *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995), our supreme court stated the

"imperfect self-defense form of second-degree murder occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief [was] objectively unreasonable." Additionally, the supreme court explained what was necessary for a trier of fact to find a defendant guilty of second degree murder. According to the supreme court, once a defendant establishes some evidence on each of the elements of general self-defense, the State must both (1) prove the elements of first degree murder and (2) negate the defendant's general self-defense claim. *Id.* at 127. A defendant's claim of general self-defense will fail if the State can establish any of the following: (1) force was not threatened against a person; (2) the person threatened was the aggressor; (3) the danger of harm was not imminent; (4) the threatened force was lawful; (5) the defendant did not actually or subjectively believe a danger existed that required the use of force the defendant applied; or (6) the defendant's beliefs were not objectively reasonable. *Id.* at 128.

¶ 66　　　　If the State fails to prove beyond a reasonable doubt that the defendant did not kill the decedent in general self-defense, the trier of fact must find the defendant not guilty of first degree murder. *Id.* at 128. However, if the State successfully negates the defendant's general self-defense claim and proves each of the elements of first degree murder, "then, and only then," may the trier of fact consider whether the defendant should only be found guilty of second degree murder based on imperfect self-defense. *Id.* at 128-29. In doing so, the trier of fact considers whether the defendant proved by a preponderance of the evidence the existence of a mitigating factor sufficient to reduce the offense of first degree murder to second degree murder. *Id.* at 129.

¶ 67　　　　Returning now to defendant's argument on appeal, defendant points to the following statement by the trial court to establish the court improperly shifted the burden of proof onto defendant to prove she acted in general self-defense to avoid being found guilty of first degree murder:

"Court starts by ruling that the offense of First Degree Murder has been proven by the State's evidence beyond a reasonable doubt. All of the elements, specifically that [defendant] armed herself with a knife and knowingly, intentionally, either/or, Court finds at least knowing conduct that caused or created a strong probability of death or in the minimum, great bodily harm, as evidenced by the multiple stab wounds, use of significant force to penetrate on a couple of those wounds five inches deep into the body of the deceased.

Then the Court is tasked with taking the evidence presented further and finding that some evidence was presented for this Court to consider a self-defense claim from Defendant ***. And in considering that evidence, then it's one of the rare circumstances in our criminal justice system where the burden then shifts and the Defendant has a burden to establish by a preponderance of the evidence that all the elements of a self-defense claim have been met."

When these comments by the trial court are read in isolation, without considering the context in which the comments were made, they are certainly troubling. However, when viewed in the context of defendant's request of the court to only find her guilty of second degree murder if the court found she did not act in general self-defense, the court's comments are much less concerning.

¶ 68    In addition, we note defendant did not object to the trial court's comments when they were made. Further, defendant failed to argue in her posttrial motion that the court's comments show it improperly shifted the burden of proof to defendant in this case. "To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48. As a result, defendant failed to properly preserve the argument she now raises on appeal.

¶ 69 Regardless of forfeiture, defendant asks this court to consider this issue pursuant to the plain-error doctrine. Our supreme court has stated:

"Illinois Supreme Court Rule 615(a) [(eff. Jan. 1, 1967)] provides that insubstantial errors shall be disregarded but that substantial or what have become known as plain errors may be noticed although they were not brought to the attention of the trial court. [Citation.] As the language of the rule indicates, a reviewing court may exercise discretion and excuse a defendant's procedural default. [Citation.] We have traditionally identified two instances when it is appropriate to do so: (1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.*

Defendant contends the alleged error is reviewable under the second prong of the plain-error doctrine. The State disagrees, arguing the trial court committed no error in applying the burden of proof in this case.

¶ 70 The initial analytical step in deciding whether an unpreserved issue can be reviewed under the plain-error doctrine is determining whether a clear or obvious error actually occurred. *Id.* ¶ 49. It is the defendant's burden to show an error occurred and the defendant is entitled to relief under the plain-error doctrine. *People v. McDonald*, 2016 IL 118882, ¶ 48.

¶ 71 Considering defendant raised an alternative argument that the trial court should only find her guilty of second degree murder based on imperfect self-defense, it is entirely possible

the court's comment about defendant's burden of proof referred only to her claim she acted in imperfect self-defense and, therefore, should only be found guilty of second degree murder. While we recognize the court did not verbally specify the State met its burden of negating defendant's general self-defense claim when it found defendant guilty of first degree murder, the trial court is presumed to understand the State bore the burden of negating defendant's general self-defense claim before finding defendant guilty of first degree murder. See *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 28 (stating a reviewing court presumes the trial court knew and properly applied the law). While this presumption may be rebutted by strong affirmative evidence in the record (*id.*), strong affirmative evidence does not appear to be present here.

¶ 72    In making its decision, the trial court was presented with a situation where defendant asked it to consider a general self-defense claim that would have justified her act of intentionally killing Seawood and—in the alternative, assuming the court did not find defendant acted in general self-defense—an imperfect self-defense claim that would not have exonerated defendant but lessened the severity of the offense. It was only after the court indicated the State's evidence had proved beyond a reasonable doubt that defendant committed the offense of first degree murder that the court stated this case presented "one of the rare circumstances in our criminal justice system" where the burden of proof shifted to the defendant.

¶ 73    As a result, based on our review of the record, considering (1) the trial court's statements in the context of defendant's alternative argument the court should only find her guilty of second degree murder and (2) the presumption the court knew and correctly applied the law, the record does not establish the court made a clear or obvious error with regard to the burden of proof in this case. Because the record does not establish the court made a clear or obvious error with regard to the burden of proof in this case, defendant's argument is forfeited, and we need not

address this issue further.

¶ 74 While we do not know whether defense counsel made a conscious decision not to object when the trial court made the comments at issue, this case shows the danger in such a strategy. This is a situation where defendant and the State should have asked the court for clarification regarding the court's statements to ensure the court was correctly applying the law and to avoid the possibility of having to retry defendant. Moreover, we would be remiss if we did not also note the best practice for a trial court is to clearly distinguish in its rulings claims of general self-defense from claims of imperfect self-defense.

¶ 75 B. Defendant's Fitness to Stand Trial

¶ 76 Defendant next argues the trial court erred in finding she was fit to stand trial after previously being found unfit. She argues Dr. Finkenbine's opinion that she lacked the ability to consult with defense counsel was facially credible and the only expert testimony to address whether she would be able to assist her attorney at trial.

¶ 77 Normally, a defendant is presumed fit to stand trial. *People v. Stephens*, 2012 IL App (1st) 110296, ¶ 90. However, at a fitness restoration hearing, a defendant is presumed to be unfit. *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 36. A defendant is unfit to stand trial if she is unable to understand the nature and purpose of the proceedings or to assist counsel in her defense. *Id.* ¶ 29. It is the State's burden to prove a defendant is fit by a preponderance of the evidence. *People v. Corbett*, 2022 IL App (2d) 200025, ¶ 50. When assessing whether a defendant is fit to stand trial, a trial court should be active, not passive, in its assessment. *Id.* ¶ 56. A court may not simply accept the parties' stipulations regarding a defendant's fitness to stand trial. *Id.*

¶ 78 When the parties have introduced the opinions of expert witnesses, a trial court may not simply rely on the expert's ultimate opinion. *Id.* Instead, the court must evaluate the basis or

bases for the experts' respective opinions. *Id.* "The mere fact that a psychiatrist expresses the opinion that the defendant is unfit does not require a similar finding by the trial court; it is the trial court's function to assess the credibility and weight to be given to a psychiatric expert's testimony." *People v. Baugh*, 358 Ill. App. 3d 718, 732 (2005). "The determination of whether a defendant is fit to stand trial must be made by the trial court, not the experts." *People v. Finlaw*, 2023 IL App (4th) 220797, ¶ 50.

¶ 79       The trial court is able to personally observe the defendant and any expert witnesses who testify before it and is in the best position to determine whether a defendant is fit to stand trial. *People v. Tapscott*, 386 Ill. App. 3d 1064, 1075 (2008). As a result, we will only disturb a trial court's fitness determination if the court's decision is against the manifest weight of the evidence. *Corbett*, 2022 IL App (2d) 200025, ¶ 47. "A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident *or* the determination is unreasonable, arbitrary, or not based on the evidence presented." (Emphasis in original.) *Id.*

¶ 80       Based on the evidence presented and the trial court's ability to observe defendant and the expert witnesses in this case, the court's fitness determination was not against the manifest weight of the evidence. The court recognized the conflicting expert testimony in this case and its duty to resolve that conflict. Considering the testimony of Dr. Killian and the evidence from Elgin, the court found the State had presented sufficient evidence to meet its burden of showing that defendant was fit for trial. Based on the evidence presented, the court found defendant had the ability to turn her symptoms on and off as she desired.

¶ 81       As for the opinions of the defense experts that defendant would not be able to assist her attorney, the trial court found this was not consistent with defendant's ability to work with the detectives after Seawood's death and the evaluators in this case. In addition, the court did not find

Dr. Finkenbine's testimony on defendant's alleged delusions persuasive. According to the court, Dr. Finkenbine's claim defendant had no incentive to malinger or exaggerate the effects of any mental illness she had "border[ed] on the absurd." The court noted defendant had showed an incentive to avoid responsibility in this case from her first interviews with the police. The court also noted defendant had exhibited no signs of distraction and appeared to be engaged while in court, listening and appropriately responding to the court's questions.

¶ 82 As for defendant's claim the trial court did not have evidence contradicting the defense experts' claim defendant could not assist her attorney, we disagree. The evidence regarding defendant's malingering simply contradicted the bases for the defense experts' opinions. The court's finding the defense experts were wrong that defendant was not malingering was not unreasonable, arbitrary, or not based on the evidence presented, and as such, it was not against the manifest weight of the evidence.

¶ 83 C. Seawood's Hearsay Statements

¶ 84 Defendant next argues the trial court erred in allowing the State to introduce hearsay statements made by Seawood to two police officers about defendant. The two officers were not State witnesses. Instead, defendant called the officers in question—Officers Delude and Brown— to present testimony about incidents where Seawood was arrested for battering defendant prior to March 24, 2018. The State then asked the officers what Seawood said about the incidents. Defendant objected, arguing Seawood's statements to the officers were inadmissible hearsay. She now argues the court erred in allowing the officers to relay what Seawood told each of them. When reviewing a trial's court's evidentiary rulings, courts normally will only find error if the court abused its discretion. *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 39.

¶ 85 1. *Officer Delude's Testimony*

¶ 86        Defendant called Officer Delude to testify about his response to a reported domestic disturbance between defendant and Seawood on February 21, 2018. Delude indicated he first met with defendant at 2103 East Capitol Avenue. Defendant had a knot on her forehead, was missing a tooth, had a cracked tooth, and was transported to the hospital. Seawood was arrested for domestic battery against defendant.

¶ 87        On cross-examination, Delude testified defendant was extremely intoxicated when he spoke with her and was holding a beer. Delude indicated defendant accused Seawood of punching her in the face and said he had a handgun. After speaking with defendant, Delude contacted Seawood at 2132 East Capitol Avenue. Delude described Seawood as cooperative and sober. The State asked Delude if Seawood made any statement about what happened. As noted above, defense counsel made a hearsay objection. The State responded Seawood's statement to Delude informed the officer's subsequent conduct regarding Seawood and defendant. The trial court indicated it would allow Delude to answer questions regarding Seawood's statements for the limited purpose of explaining Delude's subsequent actions.

¶ 88        Delude then testified that Seawood told him defendant came home intoxicated, became angry, jumped on his back, and bit him. Seawood did not deny striking defendant in the face. However, he denied having a firearm. Seawood showed Delude a fresh bite mark on his back and allowed Delude to look around his residence. Delude did not find a firearm. Delude later asked defendant if she bit Seawood, and defendant denied doing so. Delude arrested Seawood for domestic battery. Because defendant was intoxicated, Delude testified he gave her a notice to appear for domestic battery.

¶ 89        On appeal, defendant acknowledged Seawood's statement would fall under an exception to the hearsay rule because the statement was introduced to show the effect it had on

Officer Delude and to explain his subsequent actions. However, she argued the evidence should not have been allowed because its probative value was outweighed by its prejudicial effect. See Ill. R. Evid. 403 (eff. January 1, 2011).

¶ 90 From our review of the trial transcript, defendant failed to ask the trial court to disallow this evidence on the basis its prejudicial effect outweighed its probative value. As a result, the argument she makes on appeal is forfeited. "A party is required to make specific objections to evidence, based on particular grounds, and the failure to do so results in a waiver of objections as to all other grounds not specified or relied on." *Stapleton ex rel. Clark v. Moore*, 403 Ill. App. 3d 147, 156 (2010). Furthermore, we note defendant does not assert the application of the plain-error doctrine to this forfeiture.

¶ 91 2. *Officer Brown's Testimony*

¶ 92 Defendant also called Officer Brown to testify about an alleged disturbance between defendant and Seawood. Brown stated he responded to 2132 East Capitol Avenue on December 21, 2017. Defendant and Seawood were both present. Defendant showed Brown two fresh bite marks on her arm. Brown arrested Seawood for domestic battery.

¶ 93 On cross-examination, the State asked Brown if Seawood made any statements and whether those statements were against Seawood's interests. Defense counsel objected, arguing Seawood's statements were hearsay. The State responded Seawood's statements were against his own interest and also explained Brown's subsequent actions.

¶ 94 The trial court indicated it did not know if Seawood's statement was against his interest because he had not heard what the statement was. The court then stated it would overrule the objection at that time. However, the court also stated it would strike the statement and not consider it if the statement was not what the State purported it to be. Brown then testified Seawood

admitting biting defendant that morning. When Brown asked Seawood why he bit defendant, Seawood said defendant started yelling and pushing him while he was sleeping. According to Seawood, he got up and tried to get away from defendant. Seawood claimed defendant kept coming at him, and he kept trying to push her away. Brown testified Seawood indicated he had had enough of defendant's actions, grabbed her arm, and bit her.

¶ 95   When Brown was asked if Seawood indicated why defendant was angry that morning, Brown testified Seawood claimed defendant wanted him out of the house because she had another man named Robert Kelly with her. When the State asked Brown if he understood Kelly to be defendant's "on again/off again boyfriend," the trial court sustained defendant's relevance objection.

¶ 96   According to Officer Brown, defendant denied she entered the residence and started yelling at Seawood. Further, Brown testified Seawood's demeanor was calm throughout their interaction.

¶ 97   On appeal, defendant argues the parts of Seawood's statement to Officer Brown about what defendant did to him were not statements against Seawood's interests. However, defendant failed to renew her hearsay objection after Brown answered the State's question regarding what Seawood said. Moreover, defendant did not ask the trial court to strike the portion of Seawood's statement defendant now claims was not against Seawood's interest. Further, defendant provided this court with nothing from the record indicating the trial court considered those portions of Seawood's statement to Brown that defendant finds objectionable.

¶ 98   As a result, we find this argument forfeited. "To preserve an error, an objection must be timely, meaning contemporaneous with the objectionable conduct, and the objecting party must identify the same basis for his objection that he will argue on appeal." *People v. Watt*, 2013

IL App (2d) 120183, ¶ 46. When defendant did object, the trial court indicated it could not rule on the objection because it did not know what Brown was going to say. After Brown offered his testimony regarding Seawood's statements, defendant failed to renew her objection. As a result, defendant failed to make a timely objection.

¶ 99 In addition, regardless of forfeiture, the trial court indicated it would not consider any statement that was not against Seawood's interests, and defendant failed to establish the court considered any statement Seawood made that was not against his interests. Considering the presumption a trial court is presumed to only consider admissible evidence in reaching its judgment and defendant's failure to show the court considered inadmissible evidence (*People v. Wallace*, 2022 IL App (4th) 210475, ¶ 82), we presume the trial court did not consider any inadmissible hearsay offered by the State through Officer Brown.

¶ 100 III. CONCLUSION

¶ 101 For the reasons stated, we affirm the trial court's judgment in this case.

¶ 102 Affirmed.